UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

HUTCH ENTERPRISES, INC.,

                                  **Plaintiff,**

v.

THE CINCINNATI INSURANCE
COMPANY,

                                   **Defendant.**

_____

**REPORT and
RECOMMENDATION**

16-cv-01010-WMS-JJM

        Plaintiff Hutch Enterprises, Inc. commenced this breach of contract action in State of New York Supreme Court, County of Niagara, seeking to recover under a commercial insurance policy issued by defendant Cincinnati Insurance Company for storm damage to seven of its properties in Western New York in November 2014. Complaint [1-1].[1] Before the court are Cincinnati's two motions for summary judgment on the issue of coverage [63, 64], motion for partial summary judgment on the issue of damages [65], and motions to strike and preclude the testimony of Steven Thomas, Vincent DiMarco and Rick Recckio [67-69],[2] which have been referred to me by District Judge William M. Skretny for initial consideration [20]. Having

---

[1]      Bracketed references are to the CM/ECF docket entries. Unless otherwise indicated, page references are to numbers reflected on the documents themselves rather than to the CM/ECF pagination.

[2]      Although motions to preclude expert testimony are generally considered to be non-dispositive, to the extent that the motions here bear upon Cincinnati's motions for summary judgment, I have addressed them as dispositive motions. *See* Perkins v. United States, 2018 WL 3548597, *7 n. 5 (W.D.N.Y. 2018) ("[m]otions to strike are non-dispositive but can be addressed with a recommendation when intertwined with dispositive motions").

reviewed the parties' submissions [63-69, 78-86, 88-94] and heard oral argument on April 30, 2019 [98], I recommend that (1) the motions for summary judgment be granted in part and denied in part; (2) the motions to strike and preclude the testimony of Messrs. DiMarco and Recckio be granted; and (3) the motion to strike and preclude the testimony of Mr. Thomas be denied.

## BACKGROUND

Hutch was insured by Cincinnati pursuant to an "all risk" commercial insurance policy (CPP-365-84-72) effective from September 22, 2014 to September 22, 2015 for multiple properties it owned in New York State (the "Policy"). *See* Complaint [1-1], ¶2; Answer [6], ¶2; Policy [66-2], p. 2 of 125 (CM/ECF).  Hutch alleges that 89 A&B River Road, North Tonawanda, 3310 Southwestern Boulevard, Orchard Park, 3514 Delaware Avenue, Kenmore, and 6470 Transit Road, Depew sustained physical damage during a winter storm that struck Western New York in November 2014, and that Cincinnati has breached its obligations under the Policy by denying it insurance benefits. Complaint [1-1], ¶¶3, 12; Cincinnati's Statement of Material Facts [66], ¶4; Hutch's Response to Cincinnati's Request for Admissions [66], pp. 42-45 of 82 (CM/ECF), ¶¶23-30.[3]

---

[3]     The Complaint [1-1] alleges that Cincinnati also breached its obligations under the Policy for damages sustained to 1503 Seneca Street, Buffalo, 3470 Transit Road, West Seneca, and 7502 Porter Road, Niagara Falls. Id., ¶¶3, 12.  However, at oral argument Hutch's counsel acknowledged that Hutch was no longer seeking coverage for these properties.  Based on those representations, I recommend that this portion of Hutch's Complaint be dismissed. 6051 South Transit Road, Lockport, is also addressed at points in the parties' submissions (*e.g.*, Cincinnati's Memorandum of Law [64-1], p. 6), but is not included among the properties in the Complaint [1-1] that allegedly sustained covered damages. Id., ¶3. Therefore, I have not addressed that property.  In any event, even if it was part of this suit, my recommendations would apply equally.

Prior to the exchange of discovery, Cincinnati moved for summary judgment [16], which was denied without prejudice to renewal at a later date.  *See* Hutch Enterprises, Inc. v. Cincinnati Ins. Co., 2017 WL 3601899, *1 (W.D.N.Y. 2017), adopted May 15, 2017 Text Order [29].  With discovery complete, Cincinnati has filed the current motions.

## DISCUSSION

**A.    Motion to Preclude and Strike the Testimony of Hutch's Roofing Expert Steven Thomas**

In support of its claim, Hutch relies on the December 2015 reports of its roofing expert, Steven Thomas, President of Roof Leak Detection Company, Inc. ("RLDC") [86-2 - 86-4], who was retained to "conduct a forensic roof investigation at each of the properties . . . to ascertain whether there was damage to the roofing system", and if so "whether the damage was consistent with ice damming" and "whether the condition of the damages . . . were what would be expected with a timeframe of the November 2014 wind and blizzard event".  Thomas Affidavit [86-5], ¶22.   Mr. Thomas reached the following conclusions:

-- "snow accumulation, ice damming, and moisture infiltration related damages were sustained to [6470 Transit Road and 3310 Southwestern Boulevard] as a direct physical result of the 2014-2015 winter-storm season". [86-2], pp. 72, 110 of 113 (CM/ECF);

-- "windstorm related damages were sustained to [89 A&B River Road] as a direct result of the November 2014 wind and blizzard event". Id., p. 10 of 113 (CM/ECF); and

-- "ice and windstorm related damages were sustained to [3514 Delaware Avenue] as a direct result of the 2014-2015 winter storm season". [86-3], p. 95 of 130 (CM/ECF).

By contrast, Cincinnati relies on the opinion of its roofing expert, Damian Moser, P.E., who opined in his September 2018 report that the damages "either pre-date and are wholly un-related to the 2014-2015 season, or stem from pre-existing deficiencies that were potentially incrementally worsened during the 2014-2015 [winter season] as part of the on-going process of deterioration". [66-6], p. 122 of 140 (CM/ECF). Encorous Group (f/n/a RJR Engineering, P.C.) also inspected the properties on behalf of Cincinnati, and opined that "[o]nly two of the eight sites were located in the weather affected area relating to the November 2014 snowfall. The saturated roof insulation and interior damage . . . is not due to a one-time storm event. They are due to chronic leaking over time." [66-5], p. 2 of 128 (CM/ECF).

"[T]he proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the admissibility requirements of [Fed. R. Evd.] Rule 702 are satisfied". United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007). In order to satisfy that burden, Hutch must demonstrate not only that Mr. Thomas is qualified to offer an expert opinion, but also that his opinion is sufficiently reliable, which is a separate consideration. See Quiet Technology DC–8, Inc. v. Hurel–Dubois UK Ltd., 326 F.3d 1333, 1341 (11th Cir. 2003) ("although there is some overlap among the inquiries into an expert's qualifications [and] the reliability of his proffered opinion . . . these are distinct concepts that courts and litigants must take care not to conflate"). Cincinnati challenges both considerations.

To determine whether Mr. Thomas is qualified "by knowledge, skill, experience, training, or education" (Fed. R. Evid. 702) to testify as an expert, I must look "at the totality of [his] qualifications" and whether he is "proffering opinions on issues or subject matters that are within his . . . area of expertise". Bee v. Novartis Pharmaceuticals Corp., 18 F. Supp. 3d 268, 300-01 (E.D.N.Y. 2014). Cincinnati argues that Mr. Thomas is not qualified to offer an expert

opinion as to the particular cause of the roof damage or the date the damage occurred because he "is not a certified roofing contractor, a metallurgist, nor an engineer". Cincinnati's Memorandum of Law [68-1], p. 11. It contends that Mr. Thomas is otherwise "devoid of any qualifications supporting . . . that he is qualified to extrapolate from the results of either visual inspections or moisture surveys to form opinions as to causation and timing of alleged property damage". Id.

In its initial motion for summary judgment, Cincinnati made a similar argument concerning the qualifications of RLDC, contending that since it was not an engineer, it could not refute the opinions of Cincinnati's expert engineer. I rejected that argument, explaining, in relevant part:

> "the fact that RLDC is not an engineer cannot lead me, at this early stage of the case, to conclude that its opinions must be discounted entirely. See Schwartz v. Caravan Trucking, L.L.C., 2011 WL 43231, *1, n. 1 (E.D.N.Y.), adopted in relevant part, 2011 WL 703925 (E.D.N.Y. 2011) ('[d]efendants provided only boilerplate objections to Coulon's qualifications, focusing mostly on the fact that Coulon is not an engineer. However, Coulon is not attempting to testify as to a defect in manufacturing or design, which fields more readily lend themselves to experts trained specifically in engineering. Moreover, Defendants are free to raise this issue on cross-examination'). See also McCullock v. H.B. Fuller Co., 61 F.3d 1038, 1043 (2d Cir. 1995) ('Fuller's quibble with Woolley's academic training . . . and his other alleged shortcomings . . . were properly explored on cross-examination and went to his testimony's weight and credibility - not its admissibility'); Tuf Racing Products, Inc. v. American Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000) ('[t]he notion that Daubert . . . requires particular credentials for an expert witness is radically unsound. The Federal Rules of Evidence, which Daubert interprets rather than overrides, do not require that expert witnesses be academics or PhDs . . . . Anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness')." Hutch Enterprises, Inc., 2017 WL 3601899 at *4.

Having the benefit of a complete record, I conclude that Mr. Thomas is qualified to offer the opinions contained in his December 2015 reports. While he is not an engineer,

metallurgist, or meteorologist, he has several other credentials that qualify him to render an expert opinion on roof damage causation. *See* <u>Schwartz</u>, 2011 WL 43231 at *1, n. 1. *See also* <u>Tuf Racing Products, Inc.</u>, 223 F.3d at 591; <u>Canino v. HRP, Inc.</u>, 105 F. Supp. 2d 21, 27 (N.D.N.Y. 2000) ("assuming that the proffered expert has the requisite minimal education and experience in a relevant field . . .  courts have not barred an expert from testifying merely because he or she lacks a degree or training narrowly matching the point of dispute in the lawsuit").  Mr. Thomas' qualifications include being a:

    -- Certified InterNACHI Roof Inspector (Thomas Affidavit [86-5], ¶4);

    -- Certified Forensic Roofing Inspector by the National Roofing Certificate and Inspection Association (<u>id.</u>);

    -- Certified Course Instructor for Roofing and teaches courses in identifying wind and hail damage, assessing what is normal wear and tear, and determining appropriate testifying procedures (<u>id.</u>, ¶7);

    -- Certified Windstorm Umpire by the Independent Adjusters and Umpires Association (<u>id.</u>, ¶8); and

    -- Certified Uplift Testing Specialist by the Roof Consultants Institute (<u>id.</u>, ¶9).

His company, RLDC, is also a certified roof testing laboratory, and has been certified by Miami-Dade County, Florida, to perform moisture surveys, wind uplift testing, fastener uplift testing, and tile uplift testing.  <u>Id.</u>, ¶6.  He has evaluated over 20,000 roofing systems, including metal roofing systems, as a roofing inspector since 1991, testified 12 times a trial, and was a court appointed roofing expert in a federal court action.  <u>Id.</u>, ¶¶3, 15, 17.

        At least one other court has also rejected similar challenges to Mr. Thomas' credentials, and found him sufficiently qualified to render an expert opinion of roof damage causation.  *See* <u>358 Liberation LLC v. Country Mutual Insurance Co.</u>, 2017 WL 2333100, *1 (D. Colo. 2017) (rejecting argument that Mr. Thomas was not qualified to opine on damage

causation because he is not a certified roofing contractor or engineer). Therefore, I conclude that Mr. Thomas' certifications and professional experience render him sufficiently qualified to render his expert opinions in this case. *See* <u>Spearman Industries, Inc. v. St. Paul Fire & Marine Insurance Co.</u>, 138 F. Supp. 2d 1088, 1096 (N.D. Ill. 2001) ("Diederich's general expertise in the broad subject of roofing is enough to qualify him as an expert . . . . Diederich's lack of specialization in the specific aspect of what causes roof damage goes to the weight of his testimony, but it does not necessarily entail engineering and aerodynamic principals beyond his expertise"). Cincinnati's challenge to Mr. Thomas' qualifications may be explored at trial on cross-examination. *See* <u>McCullock</u>, 61 F.3d at 1043; <u>In re Zyprexa Product Liability Litigation</u>, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("[a]ssertions that the witness lacks particular educational or other experiential background, 'go to the weight, not the admissibility, of [the] testimony'").

Although a closer question, I likewise conclude that Mr. Thomas' expert opinions are sufficiently reliable. "In assessing reliability, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." <u>Williams</u>, 506 F.3d at 160. These factors "do not constitute a definitive checklist or test". <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 150 (1999).

Ultimately, the court must "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs . . . the same level of intellectual rigor that characterizes the practice of an expert in the relevant field". <u>Id</u>. at 152. Expert opinions that are "connected to existing data only by the *ipse dixit* of the expert" will be excluded. <u>General</u>

Electric Co. v. Joiner, 522 U.S. 136, 146 (1997).  However, as long as the basis for the expert

testimony at issue is supported by "good grounds", it should be admitted.  Amorgianos v.

National Railroad Passenger Corp., 303 F.3d 256, 267 (2d Cir. 2002); Emamian v. Rockefeller

University, 2017 WL 6804074, *1 (S.D.N.Y. 2017) ("[a]s long as an expert's scientific testimony

rests upon 'good grounds, based on what is known,' it should be tested by the adversary

process—competing expert testimony and active cross-examination - rather than excluded from

jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its

inadequacies"). *See also* In re Fosamax Products Liability Litigation, 645 F. Supp. 2d 164, 173

(S.D.N.Y. 2009) ("only serious flaws in reasoning or methodology will warrant exclusion").

"[S]haky but admissible" testimony may be challenged by "[v]igorous cross-examination,

presentation of contrary evidence, and careful instruction on the burden of proof ". Daubert v.

Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 596 (1993). The court has "broad discretion in

the matter of the . . . exclusion of expert evidence".  Salem v. U.S. Lines Co., 370 U.S. 31, 35

(1962).

   Cincinnati raises several challenges to the reliability of Mr. Thomas'

methodologies. It argues that Mr. Thomas did not have the benefit of inspection and maintenance

reports; performed no testing at a majority of the properties; only conducted a visual inspection

(something he warned against in his 2012 article, *If a Roof Doesn't Leak is it Damaged?*); based

his opinions on the assumption provided to him by Hutch that the loss was caused by the 2014

storm; that the moisture testing he did perform was insufficient to show the cause or timing of

the alleged damage; and that he otherwise relied on speculation for his opinion as to when the

damage occurred. Cincinnati's Memorandum of Law [68-1], pp. 12-17, 22-24.  It further relies

on the challenges made by its roofing expert, Damian Moser, to Mr. Thomas' methodologies,

and points to three other cases where Mr. Thomas' opinions were determined to be unreliable. Id., pp. 17-21.

According to Mr. Thomas, his methodology for evaluating the roofs at issue followed the industry standards codified by HAAG Engineering. Thomas Affidavit [86-5], ¶26. On the roofs that were "eligible for nondestructive testing", he performed moisture testing, but explained that there are no "nondestructive methods for performing a forensic analysis on metal roofs to determine the amount of trapped moisture". Id., ¶¶29, 31.[4] Mr. Thomas further explained that his warning not to accept visual observation reports set forth in his article *If a Roof Doesn't Leak is it Damaged*? was in reference to "roofs whose composition permits nondestructive moisture testing", but has no applicability to metal roofs. Id., ¶32. He also stated that "[t]here is no ASTM Standard for conducting moisture surveys on metal roofs", and that roofing assessments performed in accordance with industry standards as codified by HAAG Engineering and in compliance with ASTM D7053-07 do not rely on or require maintenance records to be an accurate, scientific inquiry leading to an opinion within a reasonable degree of professional certainty". Id., ¶38.

Based on Mr. Thomas' experience and qualifications in the roofing industry, the inspection he performed of all of the roofs, the available testing he performed to some of the roofs, and the industry standards pursuant to which he states his evaluation was conducted, I conclude that his methodologies are sufficiently reliable. *See* Salomon Construction & Roofing Corp. v. James McHugh Construction Co., 2019 WL 2107284, *6 (S.D. Fla. 2019) (denying motion to preclude Mr. Thomas' expert testimony where he conducted no scientific testing). *See*

---

[4]    While 6470 Transit Road and 3310 Southwestern Boulevard had metal roofs ([86-2], pp. 69, 107 of 113 (CM/ECF), 89 A&B River Road had a built up roofing ("BUR") system (id., p. 6 of 113) and 3514 Delaware Avenue utilized both BUR and EPDM (*i.e.*, synthetic rubber) roofing systems [86-3], p. 92 of 130 (CM/ECF).

*also* <u>Griffith v. Goodyear Dunlop Tires North America Ltd.</u>, 2018 WL 4658721, *4 (W.D.N.Y.

2018) (Skretny, J.) ("[d]efendant has not established that Derian's opinions are so divorced from

accepted methodology that his expert testimony should be precluded"). Cincinnati's challenges

to whether Mr. Thomas' opinions were properly based on a complete picture of the condition of

the roofs at the time of the November 2014 storm, including prior leaks,[5] and the individualized

weather conditions that may have impacted each site, implicate the weight that the jury may

afford his opinions and can be explored on cross-examination. *See* <u>Quiet Technology DC-8, Inc.</u>,

326 F.3d at 1340–41 ("although rulings on admissibility under <u>Daubert</u> inherently require the

trial court to conduct an exacting analysis of the proffered expert's methodology . . .  it is not the

role of the district court to make ultimate conclusions as to the persuasiveness of the proffered

evidence").  *See also* <u>United States v. 14.38 Acres of Land, More or Less Situated in Leflore</u>

<u>City, State of Mississippi</u>, 80 F.3d 1074, 1077 (5th Cir. 1996) ("[a]s a general rule, questions

relating to the bases and sources of an expert's opinion affect the weight to be assigned that

opinion rather than its admissibility and should be left for the jury's consideration").

---

[5]      Ken Pawlukovich, Hutch's former operations manager, testified that there were minor roof leaks
occurring to some degree at the various locations prior to 2014.  *See* Pawlukovich deposition testimony
[66-6], pp. 127 and 132 (CM/ECF) [transcript pp. 12 and 31].  Inspection reports from the mortgagee
confirm that there were pre-existing leaks at the properties. *See, e.g.*, February 2010 report for 3514
Delaware Avenue. [66-5], pp. 81, 90 of 128 (CM/ECF) ("at the time of the inspection there was some
leaking through the ceiling tiles. . . . The borrower stated that this is not due to a leak in the roof, however,
it is caused from the wind driving frost in and then melting . . . . The borrower indicated that the roof was
in good condition"); February 2010 and March 2014 reports for 6470 Transit Road.  <u>Id.</u>, pp. 97, 105
("there was some leaking through the ceiling tiles . . . . The borrower stated that this is not due to a leak in
the roof, however, it is caused from the wind driving frost in and then melting"; "[m]anagement stated
that the winter months typically bring on leaks in the rubber roof and once the weather breaks, repairs will
be made"); February 2010 report for 89 A&B River Road. <u>Id.</u>, pp. 117, 122 ("there was some leaking
through the ceiling tiles . . . . [t]he borrower stated that this is not due to a leak in the roof, however it is
caused from the wind driving frost in and then melting"); February 2011 report for 3310 Southwestern
Boulevard. <u>Id.</u>, p. 125 ("[c]eiling tiles in the subject property are receiving water damage and the tenant
has installed a drainage system . . . to offset the leaky roof").

For example, in <u>Spearman Industries, Inc.</u>, <u>supra</u>, the defendant insurer disputed whether a portion of the damage to a collapsed roof was caused or worsened by pre-existing wear and tear, deterioration, or defective installation, design, maintenance or repair, and sought to preclude testimony from the plaintiff's roofing expert, who attributed the damage to the entire roof to a winter storm. 138 F. Supp. 2d at 1093, 1095. Similar to the arguments raised here, the defendant contended that the expert's opinions were unreliable because he based "his opinion on an assumption that the roof had no damage prior to the storm, but . . . never inspected the roof before the storm" and "on inaccurate assumptions" of the wind speeds the roof encountered. <u>Id</u>. at 1098. However, those arguments were determined "to relate to the weight of [the expert's] testimony, not its admissibility". <u>Id</u>. The same holds true here.

Cincinnati also fails to demonstrate that Mr. Thomas' opinions were based strictly on the assumptions provided to him by Hutch. While it appears that Mr. Thomas was asked by Hutch to assume that the November 2014 storm caused the roof damage (*see* Thomas deposition transcript [66-4], p. 106 of 155 (CM/ECF) [transcript p. 93] ("Q. . . . you were asked to do your work based on the assumption that the November 2014 storm cause some roof damage. A. Yes")), Mr. Thomas' testimony demonstrates that this was not unusual in his industry (*see* <u>id</u>., p. 94 of 155 [transcript pp. 42-43] ("this is an insurance claim, so I was there to look for damages that were attributable to a particular storm")), and did not cause him to assume that the damage he observed was caused by the storm. <u>Id</u>. [transcript p. 43] (Q. And you were also asked to determine whether the November 2014 storm caused the damage? A. Well, I was to verify that there was a storm that was big enough to have caused that. And that's why I went to the National Weather Service and got . . . data").

I am likewise not persuaded by Cincinnati's argument that Mr. Thomas' opinion concerning the timing of the roof damage is unduly speculative. While he testified that he could not determine with 100% certainty when the damage occurred, he tied the weather events of November 2014 to the damage with a reasonable degree of certainty. *See* Id., p. 102 of 155 [transcript p. 75] ("I don't think that anybody could say 100 percent sure. I just based [my determination] on a reasonable degree of certainty and my experience and training, I believe that when you have a severe event like this and then shortly afterwards you have moisture ingress into the building, I think it's connecting the dots and so"); id., p. 101 of 155 [transcript pp. 70-71] ("It's my opinion that more likely than not it was a recent event and . . . I don't see rust marks so that tells me that was something . . . relatively recent"); id., p. 100 of 155 [transcript p. 69] ("Q. Do you know when the moisture got in the roof at this site? A. Well, it's my opinion based on a reasonable degree of certainty that I think it's more likely than not that if the weather event was capable of . . . creating enough snow and ice, that I would attribute that to that event, so. Q. But is it possible that there was moisture to the roof prior to the November 2014 storm? A. Anything is possible").

Although Hutch points to a case that excluded Mr. Thomas' testimony (358 Liberation, LLC, supra), a case that struck his testimony (Wynwood Properties Investment v. Citizens Property Insurance Corp., 2013 WL 9805032 (Fla. Cir. Ct. 2013)), and a case in which he withdrew as an expert (Ajanta, Inc. d/b/a Quality Inn of Rome v. Erie Insurance Company, No. 6:16-CV-00309-BKS-TWD, March 8, 2018 Memorandum Decision and Order (N.D.N.Y.) (unpublished)), having reviewed Hutch's detailed response (Hutch's Brief [86-7], pp. 11-17), none of these cases persuade me that his testimony in this case should be precluded. Therefore, I recommend that this motion be denied.

**B.      Motions for Summary Judgment on the Issue of Coverage**

Cincinnati brings two separate motions for summary judgment on Hutch's breach of contract claim.  The first seeks summary judgment on the grounds that Hutch has not established a fortuitous, covered loss occurred during the Policy period [63]; and the second seeks summary judgment based on the exclusions contained in the Policy [64].

**1.      Summary Judgment Standard**

"The standards governing summary judgment are well-settled. Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The party seeking summary judgment has the burden to demonstrate that no genuine issue of material fact exists.  In determining whether a genuine issue of material fact exists, a court must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant. Summary judgment is improper if there is any evidence in the record that could reasonably support the jury's verdict for the non-moving party." Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

**2.      Can Hutch Meet its Burden of Demonstrating a Fortuitous, Covered Loss During the Policy Period?**

Cincinnati argues that Hutch has "no admissible evidence whatsoever to demonstrate that a fortuitous, covered loss took place during the policy period".  Cincinnati's Memorandum of Law [63], p. 2.  While the insured bears the burden under an all risk policy "to establish that the fortuitous loss occurred during the coverage period", AGCS Marine Insurance

Co. v. World Fuel Services., Inc., 187 F. Supp. 3d 428, 439 (S.D.N.Y. 2016), that burden is "relatively light". International Multifoods Corp. v. Commercial Union Insurance Co., 309 F.3d 76, 83 (2d Cir. 2002). "A loss is fortuitous unless it results from an inherent defect, ordinary wear and tear, or intentional misconduct of the insured." Id. The insured "needs only to show a fortuitous loss; it need not explain the precise cause of the loss." Id. at 84.

Cincinnati's arguments generally track those made in support of its motion to preclude Mr. Thomas' testimony.  However, having denied that motion, I likewise conclude that Mr. Thomas' reports provide sufficient evidence to raise a triable issue of material fact as to whether a fortuitous loss occurred during the policy period.  In each of his reports, Mr. Thomas specifically attributed the damage to the "2014-2015 winter-storm season" (6470 Transit Road ([86-2], p. 72 of 113 (CM/ECF)); 3310 Southwestern Boulevard (id., p. 110 of 113); 3514 Delaware Avenue ([86-3], p. 95 of 130 (CM/ECF)) or "the November 2014 wind and blizzard event" (89 A&B River Road [86-2], p. 10 of 113).

Relying on the testimony of Hutch's owner, John  Hutchins, that the weight of the snow caused the roof damage,[6] Cincinnati argues (Cincinnati's Memorandum of Law [63-1], pp. 6-9) that Hutch cannot establish that there were unusually high snow totals at many of the properties, because it has "no weather expert to support its theory" or to rebut the opinions of Cincinnati's meteorology expert, Howard Altschule, who opined that the snowfall accumulations at 89 A&B River Road, North Tonawanda (5.3"), 6051 Transit Road, Lockport (6.3") and 3514 Delaware Avenue, Kenmore (7.0") "were located outside of the most persistent and intense lake effect snow bands and therefore experienced only a light to moderate snowfall". Reports of

---

[6]     "Q. . . . So to clarify, you're saying the weight of ice and snow opened up the seams in the steel roofs? A. Right. Q. On all eight properties? A. Yes." Hutchins deposition transcript [66-4], p. 11 of 155 (CM/ECF) [transcript p. 34].

Forensic Weather Consultants, LLC [66-6], p. 53 of 140 (CM/ECF).  Mr. Altschule also opined

that while a "heavy accumulation" occurred at 6470 Transit Road (19"), that amount of snow

was not uncommon. Id.[7]

       While Hutch presents no meteorology expert of its own, Mr. Thomas does not

rely on *solely* snow accumulation as the cause for the damage to these properties. For example,

he characterizes:

    -- 89 A&B River Road as sustaining "windstorm related damages . . . as a direct result of

the November 2014 wind and blizzard event" [86-2], p. 10 of 113 (CM/ECF);

    -- 6470 Transit Road as sustaining "snow accumulation, ice damming, and moisture

infiltration related damages . . . as a direct physical result of the 2014-2015 winter-storm season"

[86-2], pp. 31, 72 of 113 (CM/ECF); and

    --3514 Delaware Avenue as sustaining "both . . . ice and windstorm related damages . . .

as a direct result of the 2014-2015 winter storm season" [86-3], p. 95 of 130 (CM/ECF).

       Mr. Thomas also testified (*see, e.g.*, deposition transcript [66-4], p. 94 of 155

(CM/ECF) [transcript p. 43]), and his reports confirm (*see, e.g.*, November 2014 Meteorology

section of the 89 A&B River Road report [86-2], p. 5 of 113 (CM/ECF)), that he checked

weather data in rendering his opinions.  While Cincinnati correctly emphasizes Mr. Hutchins'

belief that snow accumulation contributed to the damage, he is a layman. *See* Hutch's Answer to

Interrogatory no. 20 [66], pp. 60-61 of 82 (CM/ECF) ("[p]laintiff relies on its experts to

determine causation").  Therefore, I conclude that the absence of a weather expert to support

Hutch's claims is not fatal.

---

[7]    By contrast, Mr. Altschule concluded that 3310 Southwestern Boulevard sustained 50.00" of
snow accumulation.  [66-6], p. 53 of 140 (CM/ECF).

Nor am I persuaded by Cincinnati's reliance on Ajanta, Inc., supra. Cincinnati's

Memorandum of Law [63-1], pp. 21-22. There, the plaintiff was unable to point to any

admissible evidence showing what caused its alleged roof damage because its roof expert, Mr.

Thomas, withdrew from the case and the plaintiff withdrew his expert affidavit. *See* unpublished

Memorandum Decision and Order in Ajanta, Inc. [63-1], p. 37 of 47 (CM/ECF), n. 6.

Cincinnati also argues that it is entitled to summary judgment because Hutch

initially made its insurance claim based on mere speculation. Cincinnati's Memorandum of Law

[63-1], pp. 11-13. However, the cases Cincinnati relies upon in support of that argument address

the failure to provide timely notice of a claim and whether that the insured had sufficient

information to trigger the notice provision - a distinct issue from the argument here. *See, e.g.*,

Maryland Casualty Co. v. Efficient Solutions, Inc., 2013 WL 885164, *3 (W.D.N.Y.), adopted,

2013 WL 902985 (W.D.N.Y. 2013). In any event, Cincinnati has not demonstrated as a matter

of law that Hutch's claim was made without any basis. *See* Commercial Union Insurance Co. v.

International Flavors & Fragrances, Inc., 822 F.2d 267, 272 (2d Cir. 1987) ("[t]he test for

determining whether the notice provision has been triggered is whether the circumstances known

to the insured at that time would have suggested to a reasonable person the possibility of a

claim"). Mr. Hutchins testified that he was in the hospital at the time the Property Loss Notice

was submitted to Cincinnati, and other than hearing that some of his tenants were complaining,

he relied on Steve Schulz of the Insurance Doctor, Hutch's public adjuster, who decided to

submit the claim. Hutchins deposition transcript [66-4] pp. 17-19 of 155 (CM/ECF) [transcript

pp. 61-64, 66-67].[8] While that appears to be disputed by the Insurance Doctor (*see, e.g.*, Patel

---

[8]    I agree with Cincinnati that it is confounding why Hutch's Responses to Cincinnati's Request for
Admissions (Request Nos. 23-32) state that the damage was discovered in March 2015 ([66], pp. 42-45 of
82 (CM/ECF)), when the Property Loss Notice was submitted in January 2015 [66-4], p. 56 of 155
(CM/ECF). Whether that is attributable to Mr. Hutchins' hospitalization and his deference to the

deposition transcript [66-4], p. 39 of 155 (CM/ECF) [transcript p. 46] ("Q. . . . did the Insurance

Doctor determine causes of property damage itself without any input from anyone else? A. No,

no.  Q. Okay. And so in the normal course . . . it would rely on the client for telling them what

the cause of loss was? A. Probably, yes")), at most this creates a triable issue of fact on that

question.

        Cincinnati also points to Hutch's subsequent representations to its mortgage

holder concerning the condition of the properties (*e.g.*, March 12, 2015 report for 89 A&B River

Road [66-4], p. 67 of 155 (CM/ECF) - "Management indicated that the EPDM rubber roof is in

good condition although it is leaking in the vacant space"), as establishing that Hutch

"knowingly made misrepresentations to [it] about the nature and extent of the alleged property

damage" in violation of the Fraud Endorsement to the Policy.  Cincinnati's Memorandum of

Law [63-1], p. 14-16.  In response, Hutch argues, *inter alia*, that Cincinnati fails to establish

"intentional fraud", noting that the representations that the roofs were in "good" condition "does

not automatically mean that the subject property roofs in question did not suffer any

ascertainable loss as it relates to the November 2014 winter storms".  Hutch's Memorandum of

Law [80], pp. 11-12.

        I agree. The Fraud Endorsement to the Policy states that "[w]e do not provide

coverage for any insured . . . who has made fraudulent statement or engaged in fraudulent

conduct in connection with any loss for damage for which coverage is sought under this policy".

[66-2], p. 16 of 125 (CM/ECF).  "[U]nintentional fraud or false swearing or the statement of any

opinion mistakenly held are not grounds for vitiating a policy".  Sunbright Fashions, Inc. v.

Greater New York Mutual Insurance Co., 34 A.D.2d 235, 237 (1st Dep't. 1970), aff'd, 28 N.Y.2d

_____

Insurance Doctor is unclear.  In any event, this discrepancy fails to establish, as a matter of law, that the
Property Loss Notice was impermissibly speculative.

563 (1971). "The insurer bears the burden of proving both the materiality of the misrepresentation, as well as the insured's fraudulent intent." Prendergast v. Pacific Insurance Co., 2012 WL 1044568, *6 (W.D.N.Y. 2012). Without additional evidence, Cincinnati has not met its burden of establishing Hutch's fraudulent intent as a matter of law. *See* Kittner v. Eastern Mutual Insurance Co., 80 A.D.3d 843, 847 (3d Dep't. 2011) (denying summary judgment where the defendant relied on the plaintiff's "bankruptcy filing listing the value of its property to total $5,052.93, which is in sharp contrast to the $212,427 figure set forth in the proof of loss", but "tendered no proof of plaintiffs' intent to defraud - 'a necessary element to the defense'"); Walker v. Tighe, 142 A.D.3d 549, 551 (2d Dep't. 2016) ("while the plaintiff may have given the defendants inaccurate information in his proof of loss statements, a triable issue of fact exists as to whether the plaintiff intended to defraud the defendants").

   *See also* Eurospark Industries, Inc. v. Underwriters at Lloyds Subscribing to Risk on Cover No. 97FA0071010A, 567 F. Supp. 2d 345, 353 (E.D.N.Y. 2008) ("even in those cases in which New York courts have granted summary judgment based upon false statements made by an insured, documentary evidence conclusively established that the statements at issue were in fact fraudulent when made . . . or the insured's repeated failures of recollection were wholly incredible on their face").

   Hutch also argues that if there was a fraudulent statement, it was made to its mortgage holder, rather than to Cincinnati, which does not trigger the fraud exclusion of the Policy. Hutch's Memorandum of Law [80], p. 12 ("it can only be as to Plaintiff's communications with the Defendant" that triggers the fraud exclusion). Therefore, I recommend that this motion be denied.

### 3.    Are Hutch's Claims Subject to Any Policy Exclusions?

"Under an all-risk agreement, '[o]nce [the insured] demonstrate[s] the existence of the all-risk policy and the loss,' the insurer bears the burden to prove that the loss was caused by a peril specifically excluded from coverage." Fabozzi v. Lexington Insurance Co., 639 Fed. App'x 758, 760 (2d Cir. 2016) (Summary Order). "[I]t is not sufficient for the all risk insurers' case for them to offer a reasonable interpretation under which the loss is excluded; they must demonstrate that an interpretation favoring them is the only reasonable reading of at least one of the relevant terms of exclusion." Pan American World Airways, Inc. v. Aetna Casualty & Surety Co., 505 F.2d 989, 1000 (2d Cir. 1974). "If, however, the insurer meets that burden, the insured must demonstrate that an exception to the exclusion applies." 1070 Park Ave. Corp. v. Fireman's Fund Insurance Co., 313 F. Supp. 3d 528, 536 (S.D.N.Y. 2018), aff'd, 2019 WL 2754954 (2d Cir. 2019) (Summary Order).

Cincinnati relies on the following Policy exclusions in support of its entitlement to summary judgment. Cincinnati's Memorandum of Law [64-1], Points I-IV.

### a.    Defects, Errors and Omissions Exclusion

The Policy states, in relevant part:

"**b.  Exclusions**

. . .

**(3)**  We will not pay for 'loss' caused by or resulting from any of the following: **(3)(a)** through **(3)(c)**.  However, if an excluded cause of loss that is listed in **(3)(a)** through **(3)(c)** results in a Covered Cause of Loss, we will pay for that portion of the 'loss' caused by that Covered Cause of Loss:

. . .

**(c) Defects, Errors, and Omissions**

**1)** An act, error, or omission (negligent or not) relating to:

. . .

**b)** Design, specifications, construction, workmanship;

. . .

**d)** Maintenance, installation, renovation, repair, or remodeling of part or all of any property on or off the 'premises'".  Policy [66-3], pp. 5-9 of 142 (CM/ECF) (emphasis in original).

Initially, I must determine the scope of this exclusion.  Hutch argues that "[t]he exclusion protects the insurer from becoming the guarantor of work being performed at the premises, but it does not eliminate coverage for ensuing losses caused by defective workmanship".  Hutch's Memorandum of Law [82], p. 6.  I disagree.  The plain language of the exclusion contradicts such an interpretation, nor does Hutch's argument address the maintenance provision of the exclusion.

Pointing to the mortgage holder inspections, the engineering reports prepared by Encorous and Mr. Moser, as well as Mr. Hutchins' testimony that generally no maintenance was performed on the roofs, Cincinnati argues that the exclusion applies because "the undisputed evidence shows that the damages alleged by Hutch were caused by insufficient maintenance and faulty workmanship". Cincinnati's Memorandum of Law [64-1], pp. 3-11.

"To determine 'cause' in the insurance context, New York courts must determine the 'efficient or dominant cause of the loss,' not the event that 'merely set the stage for that later event.'" Petroterminal De Panama, S.A. v. QBE Marine & Specialty Syndicate 1036, 2017 WL 253066, *4 (S.D.N.Y.  2017) (*quoting* Home Insurance Co. v. American Insurance Co., 147 A.D.2d 353, 354 (1st Dep't 1989)).  "Remote causes of causes are not relevant to the characterization of an insurance loss." Pan American World Airways, Inc., 505 F.2d at 1006.

Hence, "the causation inquiry stops at the efficient physical cause of the loss; it does not trace events back to their metaphysical beginnings." Id.

        Cincinnati relies again upon the unpublished Memorandum Decision and Order in Ajanta, Inc., supra, which it characterizes as being "directly on-point with this case". Cincinnati's Memorandum of Law [64-1], p. 3.  However, as discussed above, the evidence supporting the applicability of the exclusion in Ajanta, Inc. was "*uncontroverted*".  Ajanta, Inc. [64-1], p. 48 of 49 (CM/ECF) (emphasis added) ("[c]onsidering the uncontroverted evidence that the roof damage was caused by wear and tear and poor maintenance, and the policy's unambiguous exclusion for such damage, the Court concludes there are no material issues of fact requiring trial").

        Cincinnati also relies heavily on Superhost Hotels Inc. v. Selective Insurance Co. of America, 160 A.D.3d 1162 (3rd Dept. 2018), which it contends is "essentially identical" to this case.  Cincinnati's Memorandum of Law [64-1], p. 11. There too, the insured presented expert evidence that the property was damaged because of poor maintenance, and the insured presented *no* reliable expert evidence rebutting that showing. See Id. at 1165 (since "the submissions do not reveal that the [insured's] proposed expert's opinions as to the cause of the water damage are reliable, we agree . . .  that his affidavit failed to raise a triable issue of material fact related to the wear and tear exclusion").

        Here, by contrast, Hutch has presented admissible evidence from Mr. Thomas that controverts the opinions of Cincinnati's roofing experts that the damage was caused by the pre-existing condition of the roofs, and is sufficient at this stage (even if against the weight of the other evidence) to raise a triable issue of material fact.  Therefore, I recommend that this portion of Cincinnati's motion be denied. See Ellison v. Allstate Indemnity Co., 103 F. Supp. 3d 358,

360–61 (W.D.N.Y. 2015) ("summary judgment at this juncture would be inappropriate, because there remain several triable issues of material fact relative to whether the water damage at issue was caused by a pre-existing 'seepage' or a 'sudden and accidental' event, or some combination of the two (and if the latter, which because was predominant)"); Easy Sportswear, Inc. v. American Economy Insurance Co., 2007 WL 4190767, *9 (W.D. Pa. 2007) ("[w]hether the rain storm . . . was the cause of damage, or whether the condition of the roof was the cause or a concurrent cause of loss is a question of fact for the jury to determine. Because both sides proffer evidence in support of their arguments, in order for the Court to determine whether this exclusion applies, there must be a finding of fact to determine the actual cause or causes of loss before the Court can determine whether or not the policy excludes Plaintiff's loss under the policy"); Schwaber v. Hartford Accident and Indemnity Co., 2007 WL 4532126, *4 (D. Md. 2007) (denying motion for summary judgment on the applicability of a policy exclusion, where the "plaintiff's evidence . . . establishes a classic duel between competing experts, and judging the credibility of experts falls squarely within the province of the jury").

### b.      Wear and Tear Exclusion

In relevant part, the Policy states that "[w]e will not pay for 'loss' caused by or resulting from . . . . 1) Wear and tear; [or] 2) Rust or other corrosion, decay, deterioration, hidden or latent defect or any quality in property that causes it to damage or destroy itself". Policy [66-3], pp. 5-7 of 142 (CM/ECF) (emphasis omitted).

Relying on the admissions of Mr. Thomas and Hutch's consultant, ProScope Inc., that some of the roofs had rust and wear and tear, as well as its expert reports indicating that the damage was caused by the pre-existing condition of the roofs, Cincinnati argues that the wear

and tear exclusion applies.  Cincinnati's Memorandum of Law [64-1], pp. 14-18.  In response,
Hutch argues that it "has presented enough evidence to show that the damage to the Property was
caused by snow, wind and ice during winter storms, and <u>not</u> caused by wear and tear".  Hutch's
Memorandum of Law [82], p. 12.  I agree with Hutch that Mr. Thomas' reports create a triable
issue of fact as to whether the damage was caused by the weather conditions or the pre-existing
condition of the roofs.  *See* <u>Ellison</u>, 103 F. Supp. 3d at 360–61; <u>Easy Sportswear, Inc.</u>, 2007 WL
4190767 at *9.

Cincinnati also argues that if there are competing causes for the damage, the anti-
concurrent causation exclusion applies to bar coverage.  Cincinnati's Reply [91], pp. 4-5.  That
exclusion states that Cincinnati "will not pay for 'loss' caused directly or indirectly by any of the
following, unless otherwise provided. Such 'loss' is excluded regardless of any other cause or
event that contributes concurrently or in any sequence to the 'loss'".  Policy [66-3], p. 5 of 142
(CM/ECF).   However, by using the language "any of the following", that exclusion only appears
to apply to the exclusions under that subsection (items (a)-(h)), which are not at issue here. In
any event, issues of fact remain as to the cause (or causes) of the damage.  Therefore, I
recommend that this portion of the motion be denied.

c.    **Duty to Mitigate**

With respect to the duty of the insured to mitigate damages, the Policy states that
"[i]n the event of 'loss' to Covered Property, you must . . . . [t]ake all reasonable steps to protect
the Covered Property from further damage". Policy [66-3], p. 27 of 142 (CM/ECF).  Cincinnati
argues that Mr. Hutchins' testimony that Hutch made no attempt to shovel the snow off of its
roofs demonstrates that Hutch failed to mitigate its damages. Cincinnati's Memorandum of Law

[64-1], p. 19, *citing* Hutchins deposition transcript [66-4], p. 11 of 155 (CM/ECF) [transcript p. 35] (referring to a similar occurrence in the early 1990s, "the cost of the claim was probably four to five times what it would have been if we would have put somebody up on the roof and just shoveled it off").  I agree with Hutch that the issue of whether ascending each of the roofs to remove the accumulated snow during the November 2014 weather event can be considered a *reasonable* step to protect the property, is one that must be resolved by the jury.  Hutch Memorandum of Law [82], pp. 13-14. *See generally*  Fisher v. First Stamford Bank & Trust Co., 751 F.2d 519, 524 (2d Cir. 1984) ("[o]rdinarily, it is left to the jury to determine whether plaintiff in the exercise of ordinary care and at reasonable expense could have mitigated defendant's damages"). Therefore, I recommend that this portion of the motion be denied.


        **d.**      **Vacancy Clause**

        The vacancy clause of the Policy states, in relevant part, that "[i]f the building where 'loss' occurs has been vacant for more than 60 consecutive days before that 'loss', we will . . . . [n]ot pay for any 'loss' caused by [water damage] . . .  even if [it is a] . . .  Covered Cause[ ] of Loss".  Policy [66-3], p. 30 of 142 (CM/ECF).  The Policy defines "vacant" and "building" as follows: "[B]uilding means the entire building. Such building is vacant unless at least 31% of its total square footage is: 1) Rented to a lessee or sublessee and used by them to conduct their customary operations; or 2) Used by the building owner to conduct customary operations." Id.

        Relying on the inspection reports prepared by the mortgagee for 6470 Transit Road and 3310 Southwestern Boulevard, Cincinnati argues that these properties fell within the vacancy exclusion of the Policy. Cincinnati's Memorandum of Law [64-1], pp. 20-22.  In

response, Hutch attempts to raise a triable issue of material fact by pointing to conclusions from a Loss of Earnings Report prepared by its accountant, Vincent DiMarco, which purportedly stated that the tenants vacated these premises "immediately" prior to the loss. Hutch's Memorandum of Law [82], pp. 16-17. Yet, as Cincinnati notes, the Loss of Earnings Report is "not included in Plaintiff's Rule 56(a)(2) Statement" (Cincinnati's Reply [91], p. 7) or elsewhere in the record, and therefore fails to create a triable issue of fact as to whether the properties were vacant at the time of the loss.

However, even without Mr. DiMarco's report, I conclude that Cincinnati has not demonstrated its entitlement to summary judgment. For example, while the February 17, 2016 report for 6470 Transit Road stated that "[t]he property is currently vacant and has been since 2013", Cincinnati ignores the fact that it also stated that "[t]he tenant, Carquest, had previously been on a month to month lease. They constructed a new building at a different location in 2014 and vacated the subject property when construction of their new building was completed". [66-6], p. 22 of 140 (CM/ECF). Thus, there is a discrepancy as to whether the property was vacated in 2013 or some time in 2014. Affording every favorable inference to Hutch (as I must), I cannot conclude as a matter of law that the vacancy clause of the Policy was triggered for this property.

Likewise, the March 12, 2015 report for 3310 Southwestern Boulevard stated that "[t]here is currently no occupied space at the subject. The subject was formerly a Carquest Retail Facility but they vacated the subject in October 2013". Id., p. 27 of 140 (CM/ECF). However, giving every favorable inference to Hutch, this only establishes that the building was vacant in October 2013 and March 2015, but does not indicate the status of the building in November 2014 or the preceding 60-day period. Therefore, I conclude that Cincinnati has not

established the applicability of the vacancy clause to these premises as a matter of law, and recommend that its motion for summary judgment be denied.[9]


**C.      Motions to Strike and Preclude the Testimony of Messrs. DiMarco and Recckio**

In its Rule 26(a)(2) disclosure, Hutch identified Vincent DiMarco and Rick Recckio as "fact witnesses with potential expert testimony or opinions". [69-1], p. 20 of 23 (CM/ECF) (emphasis omitted).  It stated that these individuals were not retained as expert witnesses, but that it "reserves the right to call upon [them], to the extent that they are qualified to offer expert opinion testimony in their respective areas of knowledge and expertise". Id.  The disclosure explained that Mr. DiMarco "[m]ay be called to testify as a fact witness regarding loss of earnings suffered . . . as the result of damages caused by the winter storm events", and that Mr. Recckio "[m]ay be called to testify as a fact witness regarding market value and loss in valuation of the properties at the time of sale . . . [and] regarding loss of rents".  Id., p. 21 of 23.


**1.      Vincent DiMarco**

Cincinnati moves to strike and preclude the testimony of Mr. DiMarco because, *inter alia*, he lacks the personal knowledge of the facts which would be necessary for him to qualify as a hybrid fact/expert witness, and that Hutch failed to comply with the expert disclosure requirements of Rule 26(a)(2)(B). Cincinnati's Memorandum of Law [69-1], pp. 6-9.  In response, Hutch argues that since Mr. DiMarco's opinions derive from his personal knowledge

---

[9]      Even if it were part of this suit, the March 12, 2015 report for 6051 South Transit Road merely stated that "[t]he property is vacant", "Carquest moved to a newly constructed building in 2014.  The property is now vacant", and "[t]he subject was occupied by CarQuest, but as of 2014 is vacant" ([66-6], pp. 23, 26 of 140 (CM/ECF)), which fails to establish, as a matter of law, that the building was vacant for at least 60 days prior to the November 2014 weather event.

of "the earnings of Hutch, the building tenants, vacancies and lease agreements", he is qualified to testify as a hybrid fact/expert witness, and is exempt from the expert disclosure requirements of Rule 26(a)(2)(B). Hutch's Memorandum of Law [81], pp. 2-4.

The determination of whether a witness is considered an expert and must produce an expert report consistent with Rule 26(a)(2)(B)(i)-(vi) "lies in the source of the facts on which the witness' expert opinion is based . . . . To the extent that a witness' opinion is based on facts learned or observations made in the normal course of duty, the witness is a hybrid and need not submit a report . . . . The same witness, however, must submit a report regarding any opinions formed specifically in anticipation of the litigation, or otherwise outside the normal course of a duty." Meredith v. International Marine Underwriters, 2011 WL 1466436, *4 (D. Md. 2011). Hence, Mr. DiMarco's "proposed opinions may only encompass the facts made known to him during the course of his business dealings" with Hutch (*i.e.*, tax preparation) "for him to be considered a non-retained expert". Chambers v. Fike, 2014 WL 3565481, *4 (D. Kan. 2014).

Here, Mr. DiMarco testified that he had been Hutch's accountant since 2005 and prepared its corporate tax returns. He explained that he would take "the data that the internal bookkeepers had developed, reconcile them against bank statements, mortgage statements and other records and basically clean it up and proceed to file a corporate return". DiMarco deposition transcript [66-7], p. 7 of 95 (CM/ECF). However, the opinions he offers as to Hutch's loss earnings extend *beyond* the scope of that work, thereby demonstrating "that he was retained or specially employed to provide expert testimony in the case". Id.

For example, Hutch acknowledges that Mr. DiMarco researched the weather to quantify the loss of earnings. Hutch's Memorandum of Law [81], p. 3. He also testified that he

consulted a friend about the interpretation of certain sections of the policy and had to determine

the fair market rental value of the properties, including those that were vacant, based on

information provided by Mr. Hutchins.  DiMarco deposition transcript [66-7], pp. 7, 22 of 95

(CM/ECF).  None of these appear to be facts that would have come known to Mr. DiMarco

during the course of his ordinary tax preparation work for Hutch.  Therefore, because his

opinions extend beyond his prior work for Hutch, he should have produced a written expert

report in compliance with Rule 26(a)(2)(B)(i)-(vi).  *See* <u>Chambers</u>, 2014 WL 3565481 at \*4

("Mr. Buchman's estimations are based off several assumptions about Mr. Chambers' tree

nursery business, including future crops sales spanning a ten year period. These conclusions go

beyond the prior course of business dealings with Mr. Chambers. Instead, they specifically opine

on Mr. Chambers' alleged damages asserted in this case. For this reason, the Court concludes Mr.

Buchman is an expert whose report must comply with the Rule 26(a)(2)(B) requirements").

Cincinnati argues that Hutch did not provide any documents for Mr. DiMarco

with its Rule 26(a)(2) disclosure, "never provided an actual Expert Report" by him, and "only

produced a handful of documents for him on December 10, 2018, less than 48 hours prior to his

deposition in this case". Cincinnati's Memorandum of Law [69-1], p. 2; Cincinnati's Reply [93],

p. 4.  In response, Hutch contends that Mr. DiMarco produced seven exhibits, including "a

formalized report" shortly before his deposition. Hutch's Memorandum of Law [81], p. 4.

However, it does not attach that report, nor does it argue that the report complies with Rule

26(a)(2)(B)(i)-(vi).

If a party fails to comply with the requirements of Rule 26(a)(2)(B), it "is

not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at

a trial, unless the failure was substantially justified or is harmless." Rule 37(c)(1).  "Factors to be

considered in determining whether to impose sanctions under Rule 37 include (1) the party's explanation for the failure to comply with the disclosure requirement; (2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of continuance." Muflahi v. Erie Insurance Company, 2016 WL 1713061, *2 (WDNY. 2016) (Skretny, J.).  "[T]he non-disclosing party has the burden to demonstrate that the failure to disclose was substantially justified or that the failure was harmless". Atkins v. County of Orange, 372 F. Supp. 2d 377, 396 (S.D.N.Y. 2005), aff'd, 248 Fed. App'x 232 (2d Cir. 2007) (Summary Order).

　　　　　The only argument that Hutch advanced as to why preclusion is not warranted is that Cincinnati "suffered absolutely no prejudice from any alleged failure to comply with expert disclosure requirements", because it deposed Mr. DiMarco and had the benefit of the materials he produced in advance of the deposition.  Hutch's Response [81], p. 4. However, "deposition testimony does not cure deficiencies in the Rule 26(a)(2)(B) notice". Muflahi, 2016 WL 1713061 at *2; Castaldi v. Land Rover North America, Inc., 2007 WL 4165283, *5 (E.D.N.Y. 2007) ("[t]he failure to disclose Bristow and Pederson's opinions in a report is not harmless, as it deprives the defendants of the benefit of written explanations and justifications of these key pieces of opinion testimony. This is so even though Bristow and Pederson were deposed regarding these questions"). Also, without the benefit of the materials produced by Hutch in advance of Mr. DiMarco's deposition, I cannot conclude that Hutch has satisfied its burden of demonstrating that its failure to comply with Rule 26(a)(2)(B) was harmless.  It also fails to provide any justification for not recognizing the limitations on what opinions Mr. DiMarco could permissibly offer as a non-retained expert.

In any event, even if the materials produced by Hutch on December 10, 2018 concerning Mr. DiMarco complied with Rule 26(a)(2)(B), that production would run afoul of the August 28, 2018 deadline set forth in my Fourth Amended Case Management Order [53] for production of expert reports (id., ¶2). Although not raised by Cincinnati, that deadline could only be amended to permit an untimely report upon a showing of "good cause". *See* Rule 16(b)(4) ("[a] schedule may be modified *only* for good cause and with the judge's consent" (emphasis added)).[10] Since that did not occur, any expert report would be precluded as untimely. *See* Arnold v. Krause, Inc., 232 F.R.D. 58, 68–69 (W.D.N.Y. 2004), adopted, 233 F.R.D. 126 (W.D.N.Y. 2005) (precluding untimely expert report).

Under these circumstances, I recommend that Cincinnati's motion be granted to the extent that Mr. DiMarco may not testify as an expert. Nevertheless, Mr. DiMarco may still offer opinion testimony as a lay witness consistent with Fed. R. Evid. 701. *See* Muflahi, 2016 WL 1723061 at *2 (while the witnesses were not permitted to offer expert testimony or opinions, they were "permitted to testify as to any observations they may have made, and as to any opinions rationally based on their perceptions and not based on scientific, technical, or specialized knowledge").

### 2.    Rick Recckio

Mr. Recckio testified at his December 14, 2018 deposition that he had been contacted by Mr. Hutchins in December 2017 to value the properties. Recckio deposition

---

[10]    I am not free to ignore that requirement, for while "[t]he Federal Rules of Civil Procedure should be liberally construed . . . they should not be expanded by disregarding plainly expressed limitations". Schlagenhauf v. Holder, 379 U.S. 104, 121 (1964).

transcript [66-7], p. 85 of 95 (CM/ECF) [transcript p. 5].  At that time, he had acted as the realtor

for Hutch's properties for approximately two years, and had successfully sold some of them. Id.,

pp. 86-87 of 95 [transcript pp. 9-10].  Mr. Recckio is not an appraiser and has never testified as

an expert. Id., p. 90 of 95 [transcript p. 22]. Hutch acknowledges that while relevant documents

from Mr. Recckio were produced during discovery, no expert report was produced. Hutch's

Response [79], p. 3.

   Not surprisingly, Cincinnati and Hutch repeat many of the same arguments raised

in connection with the motion to preclude the testimony of Mr. DiMarco.  For the same reasons,

I recommended that that motion be granted, I likewise recommend that Cincinnati's motion to

strike and preclude Mr. Recckio's testimony [67] be granted.  Like Mr. DiMarco, he may still

offer opinion testimony as a lay witness consistent with Fed. R. Evid. 701. *See* Muflahi, 2016

WL 1723061 at *2.


**D.**  **Motion for Partial Summary Judgment on Damages**

   Cincinnati seeks partial summary judgment that: 1) there is no coverage for the

alleged difference between the sales price and fair market value of the properties; 2) there is no

coverage for lost rents for the vacant buildings;  and 3) there is no coverage under the Policy

until the tenant's policies are fully exhausted.  Cincinnati's Motion [65], p. 1.


  **1.**  **Coverage for the Alleged Difference between the Sales Price and Fair Market
    Value.**

   Cincinnati argues, *inter alia*, that the Policy only covers "direct physical loss to

covered property", which does not encompass Hutch's claim for monetary damages for the

difference between the sales price and the alleged fair market value of the properties.

Cincinnati's Memorandum of Law [65-1], pp. 3-4. It also relies on the absence of any expert testimony supporting Hutch's entitlement to these damages. Id., p. 5. In response, Hutch does not dispute that the Policy only provides coverage for a "direct physical loss", but argues that the cases Cincinnati relies upon address "what constitutes a 'loss' for environmental clean-up claims, and . . . have no bearing on the quantum of recoverable damages following a covered peril". Hutch's Memorandum of Law [78], p. 2.

Hutch's generalized characterization of the cases cited by Cincinnati is flawed. At least some of the cases it cites directly address whether diminution in value constitutes a direct physical loss. *See, e.g.*, Welch v. CNA Insurance Companies, 1996 WL 1353314, *3 (Mass. Super. 1996) ("the property coverage . . . is limited to direct physical loss to a dwelling, structure on the premise, or personal property. A loss of value or the inability to sell a piece of land is clearly not intended to be within the scope of coverage of the insurance contract"). Hutch makes no attempt to distinguish those cases. Nor does it cite any cases or authority supportive of its position. Hutch further fails to respond to Cincinnati's argument that it cannot support this portion of its claim for damages without the expert testimony.

Therefore, I recommend that this portion of Cincinnati's motion be granted. *See* Gustavia Home, LLC v. Hoyer, 362 F. Supp. 3d 71, 86 (E.D.N.Y. 2019) ("a party concedes through silence arguments made by its opponent that it fails to address"); CVS Pharmacy, Inc. v. Press America, Inc., 377 F. Supp. 3d 359, 383 (S.D.N.Y. 2019) ("a party may be deemed to have conceded an argument by failing to address it in its briefing"); Dean v. University at Buffalo School of Medical and Biomedical Sciences, 804 F.3d 178, 187 (2d Cir. 2015) ("given their failure to address [the argument] . . . the district court assumed that Defendants conceded that issue").

2.    **Coverage for Lost Rents from the Buildings that were Vacant at the Time of the Loss.**

Cincinnati argues that Hutch is not entitled under the Policy to recover lost rents from those properties that were vacant at the time of the November 2014 storm. Cincinnati's Memorandum of Law [65-1], p. 6. Alternatively, Cincinnati points to the absence of evidence submitted by Hutch demonstrating that it could have rented the property to a new tenant but for the property damage. Cincinnati's Memorandum of Law [65-1], p. 6 ("[p]laintiff cannot create coverage by speculating that it might have rented the buildings").

The Policy provides, in relevant part, that Cincinnati "will pay for the actual loss of 'Business Income' and 'Rental Value' . . . sustain[ed] due to the necessary 'suspension' of your 'operations' during the 'period of restoration'". [66-3], p. 16 of 142 (CM/ECF). It defines "Rental Value" as "'Business Income' that consists of . . . Net Income (Net Profit or Loss before income taxes) that would have been earned or incurred as rental income from tenant occupancy". Id., p. 35.

I agree with Hutch that this provision does not specify that the property must be occupied by a tenant at the time of the loss for the coverage to apply. For example, Cincinnati itself cites to Ventura Kester, LLC v. Folksamerica Reinsurance Co., 219 Cal. App. 4th 633, 641 (2013), which addressed a similar policy provision that covered "reimbursement for loss of rents actually sustained by the owner or lessor of property on occupied portions of premises, which are caused to be untenable, for the period of time necessary to restore the property". In rejecting the insurer's argument that the provision for loss of rents should be interpreted to mean rent from an existing tenant, the court explained that "the plain language of the policy does not limit recovery or calculate lost rents . . . . If the insurer had wanted to limit the recovery or calculate the rents

based on existing tenants at the time of the building damage, it clearly could have written the policy to provide that". Id. at 641-42. *Compare with* Auto-Owners Insurance Co. v. Neisler, 334 Ga. App. 284, 289 (2015) (the policy "unambiguously requires that the property actually have a tenant at the time of loss. Indeed, the final sentence in this provision makes clear that Auto–Owners will pay the insured's loss of normal rents 'only for the shortest time needed to make *the rented part* fit to live in'" (emphasis in original)).

However, even if lost rents from the buildings that were vacant at the time of the loss are recoverable under the Policy, Hutch still must offer more than speculation for its entitlement to those damages. *See* Schonfeld v. Hilliard, 218 F.3d 164, 172 (2d Cir. 2000) ("[a]lthough lost profits need not be proven with mathematical precision, they must be capable of measurement based upon known reliable factors without undue speculation"). Hutch fails to respond to Cincinnati's argument that this portion of its damages claim should be dismissed as speculative, much less point to any non-speculative evidence suggesting that the vacant parcels at the time of the loss would have been rented. *See* Ventura Kester, LLC, 219 Cal. App. 4th at 644 (finding that a triable issue of fact existed where the insured presented evidence that a potential tenant "declined to lease the property in part due to the delay required to resolve the insurance claim"). Therefore, I recommend that this portion of the motion be granted.

### 3.    Exhaustion of the Tenant's Coverage

Cincinnati argues that "[m]any of the leases between [Hutch] and its tenants require that the tenant obtain all risk coverage on the property that names [Hutch] as an insured on the tenant's policy", and that under the "Other Insurance" clause of the Policy, it is "excess to the tenants' policies" and "has no obligation to pay until [Hutch] proves that its overage under

-34-

the tenants' policies is exhausted". Cincinnati's Memorandum of Law [65-1], p. 9.[11]  In

response, Hutch argues "that when interpreting 'other insurance' clauses if 'there are multiple

polices covering the same risk, and each generally purports to be excess to the other, the excess

coverage clauses are held to cancel out each other and each insurer contributes in proportion to

its limit amount of insurance.'" Hutch's Memorandum of Law [78], p. 4 (*quoting* Lumbermens

Mutual Casualty Co. v. Allstate Insurance Co., 51 N.Y.2d 651, 655 (1980)).  It contends that

"issues of material fact exist which preclude the granting of summary judgment . . . because

Cincinnati has not shown that there were policies held by Hutch's tenants that, in fact, covered

the relevant loss so as to trigger the 'other insurance' clause." Id., p. 5.  Since the tenants'

insurance policies (if any) are not part of the record, I agree that Cincinnati has not demonstrated

its entitlement to summary judgment on this portion of its motion, and recommend that it be

denied.


## CONCLUSION

For these reasons, I recommend that Cincinnati's (1) motion to strike the

testimony of Steven Thomas [68] be denied; (2) motions for summary judgment on the issue of

coverage [63, 64] be granted to the extent that they seek dismissal of claims for damages to 1503

Seneca Street, 3470 Transit Road, and 7502 Porter Road, but otherwise be denied; (3) motions to

strike and preclude the testimony of Vincent DiMarco and Rick Recckio [67, 69] be granted; and

---

[11]  The Other Insurance clause states "1. You may have other insurance subject to the same plan, terms, conditions and provisions as the insurance under this Coverage Part. If you do, we will pay our share of the covered 'loss'. Our share is the proportion that the applicable Limit of Insurance under this Coverage Part bears to the Limits of Insurance of all insurance covering on the same basis.  2. If there is other insurance covering the same 'loss', other than that described in 1. above, we will pay only for the amount of covered 'loss' in excess of the amount due from that other insurance, whether you can collect on it or not." Policy [66-2], p. 124 of 125 (CM/ECF).

(4) motion for partial summary judgment on the issue of damages [65] be granted to the extent that it seeks dismissal of Hutch's damages for the difference between the sales price and fair market value of the properties and lost rents from the properties that were vacant at the time of the loss, but otherwise be denied.

Unless otherwise ordered by Judge Skretny, any objections to this Report and Recommendation must be filed with the clerk of this court by August 26, 2019. Any requests for extension of this deadline must be made to Judge Skretny. A party who "fails to object timely . . . waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985). Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection . . . supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new

arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

Dated: August 12, 2019

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge